JOHN Y. CHISHOLM, Trustee in Bankruptcy, etc., Defendant in Error, *vs.* THE FIRST NATIONAL BANK OF LEROY, Plaintiff in Error.

*Opinion filed June 24, 1915—Rehearing denied October 8, 1915.*

1. BANKRUPTCY—*statement of the "net results" rule as to preferences.* Where there is a running account between the parties and the effect of payments made is to keep the account alive, with the result that new credits are extended and new goods placed in stock which make a net gain to the bankrupt estate, the payments made on the open account for goods sold and delivered within the four months' period mentioned in section 68 of the Bankruptcy act, without knowledge on the part of the creditor of the debtor's insolvency, are not void as a preference, the net results of the transaction being to increase and not deplete the creditor's estate.

2. SAME—*charging off overdraft to general checking account is not a preference.* Where money is deposited by a debtor in his general deposit and checking account at the bank in the regular course of business, the charging off by the bank against such deposit of an overdraft on his account is not a preferential payment prohibited by section 68 of the Bankruptcy act, even though the depositor, after continuing his deposits and checking against his account for a few days, goes into bankruptcy.

3. SAME—*when satisfaction of note to bank is a preferential payment.* Where a debtor, a few days before going into bankruptcy, sells certain property and receives in payment therefor a check made payable to the bank where he keeps his account, the action of the bank in satisfying a note held by it against the debtor without depositing the money in the debtor's account and receiving a check from him in payment of the note must be regarded as a preferential payment within the prohibition of section 68 of the Bankruptcy act.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of McLean county; the Hon. COLOSTIN D. MYERS, Judge, presiding.

LESLIE J. OWEN, and DEMANGE, GILLESPIE & DEMANGE, for plaintiff in error.

LIVINGSTON & BACH, and WELTY, STERLING & WHITMORE, for defendant in error.

Mr. JUSTICE CRAIG delivered the opinion of the court:

Defendant in error, John Y. Chisholm, trustee in bankruptcy of the Clark Grain and Elevator Company of LeRoy, Illinois, brought his action in assumpsit in the circuit court of McLean county against plaintiff in error, the First National Bank of LeRoy, to recover certain alleged preferential payments of money made to it contrary to the provisions of the national Bankruptcy law. A trial was had before a jury, resulting in a verdict and judgment in favor of the defendant in error for $8815. On appeal to the Appellate Court for the Third District this judgment was reversed and the cause remanded for another trial. (*Chisholm* v. *Bank of LeRoy,* 176 Ill. App. 383.) A second trial was then had and resulted in a verdict and judgment in favor of defendant in error for $10,718, which judgment, on appeal to the Appellate Court, was affirmed. A writ of *certiorari* was allowed and the cause is now in this court pursuant to such writ.

The Clark Grain and Elevator Company (hereinafter called the grain company) was a corporation organized under the laws of this State. Plaintiff in error is a national bank, organized under the national Banking law, and is engaged in the general banking business at LeRoy. At and prior to the time of this transaction its combined capital stock and surplus amounted to $60,000. Under the provisions of the national Banking law it was not allowed to make loans to any one customer to exceed ten per cent of its combined capital stock and surplus. (5 Fed. Stat. sec. 5200.) Prior to November 1, 1910, the grain company was engaged in the business of buying and selling grain at Argenta, Illinois. On that date it disposed of its elevator there and purchased one at LeRoy for $12,500. It paid $6000 in cash on the purchase price and gave a mort-

gage on the elevator for the balance. At the same time it also leased another elevator at LeRoy and one at Empire, Illinois. On November 4, 1910, it began to operate these elevators and at that time opened an account with plaintiff in error, known as the LeRoy account, to which account it deposited $1000. On November 25 it negotiated a loan of $1000 from the plaintiff in error and opened a second account with it, known as the Empire account. These accounts were general checking and deposit accounts and were overdrawn much of the time in 1911. The LeRoy account was continuously overdrawn from January 17 to February 9. On February 14 the overdraft was $5746.68 and on March 18, $4027.51, and it varied between February 14 and March 20 from $3500 to $6769.87. The Empire account was continuously overdrawn from February 23 to March 20, 1911, at which time the overdraft in this account, amounting to $1438.59, was transferred to the LeRoy account. On February 1, 1911, the grain company borrowed $5000 from plaintiff in error on its demand note. On March 20 it disposed of its elevator at LeRoy and a crib of corn it had on hand to one Crumbaugh, from whom it had purchased the elevator, and received in payment two checks,—one for $6360, the other for $2337, or $8697. The checks were made payable to the order of plaintiff in error. With this money the $5000 note and accumulated interest, amounting to $40, were paid and the note surrendered, and the balance of $3657.50 was deposited in the bank to the credit of the grain company's account. This transaction was consummated at about the opening of banking hours on the morning of March 20, 1911. Later in the day plaintiff in error received two drafts, amounting to $980, with way-bills attached, for two cars of corn, which were also deposited to the general credit of the grain company's LeRoy account, making the total deposits to its credit for the day $4637.50. Its overdraft at the opening of business on March 20 was $4027.50, so that had no

checks been drawn on that account during the day it would have had a balance to its credit of $610 at the close of business on March 20, 1911. During the day, however, checks were drawn on this account and paid, including one for the Empire overdraft, aggregating $1643.59, leaving an overdraft on the grain company's account of $1033.59 at the close of business for the day. On March 21 the further sum of $1895 was deposited to this account, which would have left a credit of $867.41 to its account had no further checks been drawn against it that day and paid. During this day, however, checks to the amount of $1159.79 were drawn against the account and paid, leaving an overdraft at the close of business for the day of $298.38. March 22 another check for $1.86 was drawn on this account and paid, thus increasing the overdraft to $300.25. At some time during the day of March 21 other checks were presented for payment, which the cashier requested the payee to hold for a day or two or until such time as more money was deposited to the credit of the grain company's account. Upon learning of this action on the part of the cashier the officers of the grain company opened an account with the Keenan bank of that city, where deposits were made aggregating $4665.26 at the close of business on March 22, at which time it ceased doing business. On May 15, following, the grain company was declared an involuntary bankrupt. This action was brought to recover the proceeds of the sale of the elevator and crib of corn, amounting to $9677.50, as a preferential payment, which, with interest to the time of trial, amounted to $10,718,—the amount of the verdict and judgment subsequently rendered.

The evidence shows that at the time the grain company began business with plaintiff in error its assets consisted of an equity of $6000 in the elevator and $1385 in cash, and that shortly thereafter it expended $1171 in making improvements on the elevator. At this time it owed Thayer & Co. $5000 on a note, with interest from July, 1910, and

had corn bought under contracts for future delivery at Argenta on which it sustained a loss of between $2000 and $3000 by reason of a decline in the market. The exact time when the losses first occurred by reason of the drop in the market price of corn is not clearly shown by the evidence. It further appears that on November 28, 1910, H. C. Clark, president of the grain company, borrowed $1063.97 on his life insurance policies, which sum he deposited to the credit of the grain company's account. On November 30, 1910, the grain company borrowed the further sum of $2500 from one Boyd, a grain commission merchant of Indianapolis, which also was deposited to its credit with the plaintiff in error. On December 28, 1910, Clark used $3025 of this fund in paying a debt of the H. C. Clark Grain Company of Oklahoma,—a different company from the Clark Grain and Elevator Company and for which debt the latter company was in no way responsible. The money so paid was a total loss to the grain company, as the company for which it was paid was financially irresponsible. On February 13, 1911, the leased elevator in LeRoy, with its contents, of the value of about $6000, burned and was almost a total loss to the grain company, as it had but $500 insurance on the contents of the elevator. As a result of these losses the grain company ultimately disposed of its property and ceased doing business on March 22, 1911.

Plaintiff in error insists the grain company was insolvent at the time it commenced business in LeRoy, which fact was unknown to plaintiff in error until after March 20, and that the net result of the transactions between it and the grain company was to increase the assets of the latter company more than $1000, and that therefore, under the "net result rule," the payments made to it are not voidable as preferences. *Jaquith* v. *Alden*, 189 U. S. 78, (47 L. ed. 717,) and *Wild & Co.* v. *Provident Life and Trust Co.* 214 U. S. 292, (57 L. ed. 1003,) and other cases, are cited

in support of this contention. In each of the above cases cited there was a running account between the parties, and the effect of the payments made was to keep the account alive, with the result that new credits were extended and new goods placed in the stock which resulted in a net gain to the bankrupt estate, and it was there held that payments made on an open account, in the regular course of business, for goods sold and delivered within the four months' period, without knowledge on the part of the creditor of the debtor's insolvency, were not voidable as a preference where the net result of such transactions was to increase, and not deplete, the creditor's estate. Under these holdings it would seem the plaintiff in error had a right to have such questions submitted to the jury under proper instructions, but no proper instruction on that question was offered by it. The instruction tendered was as follows:

"If you believe, from the evidence, that the Clark Grain and Elevator Company was insolvent at the time it began business dealings with the defendant and that it continued to be insolvent during all of its dealings with the defendant, and that the net result of such dealings was to increase the assets of said Clark Grain and Elevator Company and also to increase its indebtedness to the defendant, then, under the law, there was no preference and your verdict should be for the defendant."

This instruction omitted, among other elements, the elements of open account, knowledge of insolvency and payments made in the regular course of business, and was properly refused.

It is next insisted plaintiff in error had a right to apply the money received from Crumbaugh and on the bills of lading to the grain company's indebtedness to it under the provisions of section 68 of the Bankruptcy act, which permits mutual accounts between the parties to be set off one against the other. In considering this question it will be necessary to distinguish between the money applied on

the note and the money deposited to the grain company's general checking and deposit account in the bank, for the reason that the two transactions are governed by different principles of law.

Section 68 of the Bankruptcy act provides as follows:

"(*a*)  In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other and the balance, only, shall be allowed or paid. (*b*)  A set-off or counter-claim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate, or (2) was purchased by or transferred to him after the filing of the petition, or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy."

This section was construed in *New York County Nat. Bank* v. *Massey*, 192 U. S. 142, (48 L. ed. 380,) where it was held that money deposited in a general checking and deposit account could be set off by the bank against debts due it from the bankrupt. It was there said: "It can not be doubted that, except under special circumstances or where there is a statute to the contrary, a deposit of money upon general account with a bank creates the relation of debtor and creditor. The money deposited becomes a part of the general funds of the bank, to be dealt with by it as other moneys, to be lent to customers and parted with at the will of the bank, and the right of the depositor is to have this debt re-paid, in whole or in part, by honoring checks drawn against the deposits. It creates an ordinary debt—not a privilege or right of a fiduciary character. (*National Bank* v. *Millard*, 10 Wall. 152; 19 L. ed. 897.) * * * It is true that it creates a debt, which, if the creditor may set it off under section 68, amounts to permitting a creditor of that class to obtain more from the bankrupt's estate than creditors who are not in the same

situation and do not hold any debts of the bankrupt subject to set-off. But this does not, in our opinion, operate to enlarge the scope of the statute defining preferences, so as to prevent set-off in cases coming within the terms of section 68a. If, this argument were to prevail, it would, in cases of insolvency, defeat the right of set-off recognized and enforced in the law, as every creditor of the bankrupt holding a claim against the estate subject to reduction to the full amount of a debt due the bankrupt receives a preference in the fact that to the extent of the set-off he is paid in full." To the same effect are *Continental and Commercial Trust and Savings Bank* v. *Chicago Title and Trust Co.* 229 U. S. 435; 57 L. ed. 1268; *Studley* v. *Boylston Nat. Bank,* 229 U. S. 523; *Tomlinson* v. *Bank of Lexington,* 76 C. C. A. 400; 145 Fed. Rep. 824; *Toof* v. *City Nat. Bank of Paducah,* 124 C. C. A. 118; 206 Fed. Rep. 250. As stated in Remington on Bankruptcy, (vol. 11, 2d ed. sec. 1180) : "A deposit in bank is not a preference, even when applied upon a debt with full knowledge of the debtor's insolvency, where it has been made as a general deposit subject to check and creating the relation of debtor and creditor, and not made as a deposit to pay a particular debt, and therefore, not being a preference, it is available as an offset to the debtor's note or other debt." *Booth* v. *Prete,* 81 Conn. 636; 20 L. R. A. (N. S.) 863, and cases cited.

In the *Continental and Commercial Trust and Savings Bank case, supra,* it was held that a balance on deposit subject to check for a specific purpose might be applied by the bank to the payment of the depositor's indebtedness to it without violating the prohibitions of the Bankruptcy act against preferential transfers, although the transaction took place within four months of the bankruptcy proceedings, and the bank at the time had reasonable cause to believe the depositor was insolvent. In *Studley* v. *Boylston Nat. Bank, supra,* it was held the enforcement by a bank of its lien or

right of set-off by applying deposits, honestly made in due course of business and without intent to prefer the bank, to the payment of the depositor's notes in the bank's favor as they matured, did not constitute a preference forbidden by the act although within four months of the bankruptcy proceedings, there being nothing in section 68*a* of that act which prevents the parties from voluntarily doing before the petition in bankruptcy is filed what the section itself requires to be done after the proceedings in bankruptcy are instituted. And in *Tomlinson* v. *Bank of Lexington, supra,* on the authority of *New York County Nat. Bank* v. *Massey, supra,* it was held that the charging off by the bank of an overdraft to the debtor's deposit account, made in the usual course of business, did not amount to a preference which would require the bank to surrender the deposit as a condition to filing its claim against the bankrupt's estate for a balance due it.

The facts in this case which are shown by the evidence bring the plaintiff in error clearly within the law as it has been announced and applied in the above cited cases. Here the money was deposited to the general account of the grain company in the usual course of business of the parties. It was treated in no different way from any other deposit theretofore made by the grain company to its account while it transacted business with plaintiff in error. It is in no way distinguishable from the other deposit made on the following day. Defendant in error does not seek to recover any portion of this last deposit, but, on the contrary, concedes that it was made in the usual course of business and is not recoverable as a preference. We are unable to see any difference in the two deposits. Both were made in the usual course of business of the parties and placed to the general credit of the grain company, subject to its check. Both were treated precisely alike by them in their dealings, and we find nothing in the record which would warrant us in holding the one recoverable as

a preference and the other not. The source from which the money was received did not and could not alter the general character of the deposit when once it was placed to the general credit of the grain company's account with plaintiff in error. The proceeds of the payment made by Crumbaugh to the grain company, over and above what was applied on the note, and the proceeds of the two bills of lading, were deposited to the account of the grain company and remained subject to its check, and checks were drawn against it and paid from it even after the credit established by the deposits had been fully exhausted. That the deposits in question were made in the usual course of business is conclusively established by the evidence, which shows that the grain company exercised the right to check against the account, and drew checks against it on March 20, 21 and 22, which were duly honored by plaintiff in error. Had the grain company continued to make deposits to its account and deposited the $4665.26 with plaintiff in error that it deposited with the Keenan Bank, for all that this record shows there would have been a balance to its credit with plaintiff in error at the time it suspended business, March 22, 1911. The fact that the officers of the plaintiff in error were insisting that the grain company pay its overdraft cannot have the effect of making the deposits made by the grain company to its general account, in the usual course of business, void as a preference, when they were neither made nor received in payment of a pre-existing debt or with the intention of closing its account. It was the duty of the bank officers, under the law, to insist that the overdraft be reduced. The indebtedness of the grain company to the bank was greater than the amount allowed by law to any one borrower. The act of the grain company in transferring its business to another bank did not alter the relation of debtor and creditor or deprive plaintiff in error of its right of set-off after it had once accrued. The right of set-off was established by the course of deal-

ings between the parties, and under the rule laid down in *New York County Nat. Bank* v. *Massey, supra,* and cases cited above, the money deposited to the general account of the grain company with plaintiff in error was properly applied in satisfaction of any mutual debt owing by that company to the plaintiff in error. The overdraft in question was a debt of that character.

The cases of *Hotchkiss* v. *National City Bank,* 200 Fed. Rep. 287, and *Ernst* v. *Mechanics and Metals Nat. Bank,* 201 id. 664, relied upon by the defendant in error, do not oppose this view. Both of these cases were subsequently passed upon by the Supreme Court of the United States. In the *Hotchkiss case* suit was brought to recover securities transferred by an insolvent firm of brokers to a bank in payment of what is called a "clearance loan,"—that is, a loan of money to be used to purchase securities which are later to be deposited as security for such loan. The money must be loaned and the securities bought and paid for before they can be deposited as such security. In that case the transfer of the securities was made after the brokers had suspended business on the stock exchange because of insolvency and with knowledge of that fact by the bank officers and also with knowledge that a petition in bankruptcy was about to be filed. No question of bank deposits made in the usual course of business was involved. In fact, deposits amounting to several hundred thousand dollars were made by the insolvent firm with the bank the same day on which the loan was made and the firm became insolvent, and it seems from the opinion that such deposits were applied without question on the indebtedness of the firm and no question raised that such deposits were a preference. Some of the securities transferred bore no relation to the clearance loan and were not purchased with the money furnished by the bank on such loan, and the broker transacted no further business with the bank after the securities were transferred. On these facts it was held in

*National City Bank* v. *Hotchkiss,* 231 U. S. 50, (58 L. ed. 115,) that the transfer of the securities was voidable as a preference, but that the securities,—not their value, where they had depreciated in value,—might be recovered by the trustees of the bankrupt.   In the *Ernst case* the deposit was made after the cashier of the bank, because of the threatened insolvency of a firm of stock brokers, had forbidden payment of checks drawn against the deposit account and thereby closed the account.   The deposit was not made in the regular course of business and was not subject to check after it was made.   The broker suspended business a few minutes after making the deposit, and a few hours after it was made the petition in bankruptcy was filed.   The court held that as the so-called deposit was paid in after the cashier had forbidden payment of checks against the deposit account the payment was voidable as a preference.   *Mechanics and Metals Nat. Bank* v. *Ernst,* 231 U. S. 60;  58 L. ed. 121.

The above two cases illustrate the point in question and are clearly distinguishable from each other and from the case at bar on the facts, and manifestly can have no application to any question involved here, except the payment on the $5000 note made the morning of March 20, 1911. As to this item a different situation is presented.   The money with which it was paid never was deposited in the general account of the grain company and the situation of mutual accounts between the parties as debtor and creditor was never established as to it.   On the contrary, the money was received and was applied directly in payment of the note with the intention of extinguishing the pre-existing debt evidenced by it.   The payment on the note, therefore, is governed by the rule announced in *Pirie* v. *Chicago Title and Trust Co.* 182 U. S. 444, *Hotchkiss* v. *National City Bank, supra,* and *Mechanics and Metals Nat. Bank* v. *Ernst, supra,* and is voidable as a preference.   However, had this portion of the fund also been deposited to the general credit

of the grain company's account, thus establishing the relation of debtor and creditor having mutual accounts, and had a check then been drawn in payment of the note, the transaction would be governed by the rule announced in *New York County Nat. Bank* v. *Massey, Studley* v. *Boylston Nat. Bank,* and *Booth* v. *Prete, supra,* and not voidable as a preference. *Toof* v. *City Nat. Bank of Paducah, supra.*

It is also urged that the court erred in the admission and rejection of evidence. The errors complained of are of such a character that they are not apt to occur again, and we deem it unnecessary to do more than state that we think the objection to the admission of the schedule of debtors and creditors, and what the attorney said about the conveyance of March 20 at the creditors' meeting held five days later, should have been sustained. Evidence of insolvency and the existence of other creditors of the same class was expressly admitted. Neither do we think the deposit slip showing the special character of the deposit made with the other bank as a trust fund for the benefit of the grain company's creditors should have been admitted. The character of that deposit was not an issue in the case, and its admission in evidence could only tend to confuse the jury as to the general character of the deposits made with plaintiff in error. The deposit slip with the other bank had no bearing on any issue in the case, and the objection thereto should have been sustained.

For the reasons given, the judgments of the Appellate and circuit courts will be reversed and the cause remanded to the circuit court for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*