## IRVING TRUST CO. v. BANK OF AMERICA NAT. ASS'N.

District Court, S. D. New York.
April 11, 1933.

Morris, Plante & Saxe, of New York City (David S. Elkins, of New York City, of counsel), for plaintiff.

Zalkin & Cohen, of New York City (Moses Cohen, Nathan Coplan, and Israel Akselrod, all of New York City, of counsel), for defendant.

FRANK J. COLEMAN, District Judge.

The question presented is whether a voidable preference was created in favor of the defendant bank by the repayment of a day loan which had been made to the bankrupt on the same day, which was the day before the petition in bankruptcy was filed. The bankrupt, Broomhall, Killough & Co., Inc., was a dealer in securities and had a long standing arrangement with the defendant in relation to day loans. These were applied for each morning before the opening of the market with the understanding that they would be repaid the same day and the application was a routine matter effected by the delivery to the bank of a printed form of note together with the borrower's check, both in the amount of the loan. The note was in the following form, in which the borrower inserted the amount applied for:

"New York ——— 19—

"The undersigned hereby applies to the Bank of America National Association, for a loan of ——— Dollars ($———), to be credited to the account of the undersigned, upon the terms and conditions below stated and to be repaid at or before the close of business this day. The avails of the said loan shall be received and used by the undersigned only for one or both of the following purposes: To pay, in whole or part, the purchase price of, and thus to obtain certain securities which the undersigned has contracted to purchase and receive; or, to pay in whole or part another loan or other loans heretofore made to the undersigned and thus, to release certain securities held as collateral to such other loan or loans. The undersigned, as trustee for the Bank, shall obtain possession of the securities aforesaid; and shall deliver, or cause to be delivered, the same to the Bank, as security for this loan, before the close of business on this day, unless in the meantime the amount of this loan shall have been repaid to the Bank. The undersigned may, however, before the close of business this day, sell or transfer, for cash or its equivalent, or pledge for money contemporaneously loaned, or exchange for other securities, any or all of said certain securities, but the proceeds of such sales, transfers and pledges, shall be received by the undersigned as trustee for the Bank, and shall be delivered by the undersigned to the Bank before the close of business this day where they shall be credited in payment pro tanto of said loan, and the securities received in exchange shall be in all respects charged with the same trust, and subject to the same rights of the bank of possession, and otherwise, as herein provided in respect of the certain securities so exchanged.

"The undersigned, as further security to the Bank hereby assigns to the Bank, its successor and assigns, all of the right, title, and interest of the undersigned to and in the certain securities hereinabove referred to, and to and in any and all claims of the undersigned against third parties now existing and that may be created this day for the purchase price, or any present unpaid balance thereof, of any of said certain securities sold or that may be sold by the undersigned, and to and in all claims of the undersigned against customers of the undersigned for the balance due or to become due this day of the purchase price of any of said certain securities delivered or deliverable to such customers.

"Nothing herein contained is intended to lessen the liability of the undersigned to the Bank arising from the making of said loan; nor to impair the effect of any General Collateral Agreement given by the undersigned to the Bank; nor to confer upon the undersigned any authority to create any liability on the part of the Bank.

"_____"

On July 2, 1930, the bankrupt in ordinary course applied for and received a loan of $150,000 which the defendant made by crediting the bankrupt's general deposit account with that amount. During the day some intimation of the bankrupt's critical financial condition reached the defendant, and at about 3 o'clock two of the defendant's officers went to the bankrupt's place of business and received for deposit checks in excess of the bankrupt's withdrawals against the day loan. Part of these deposits were subsequently repaid to the trustee, leaving $82,156.58 in the hands of the defendant, which the latter has applied in full payment of the balance due on the bankrupt's withdrawals against the day loan. This is the sum in suit, and the question presented is whether the defendant had the right to retain it in full payment, whereas the general creditors will receive only a small percentage.

On the day following the loan, July 3d, the petition in bankruptcy was filed, and it is undisputed that the bankrupt had been insolvent for a long period before. There can be no substantial doubt but that when the defendant received the $82,156.58 it had reasonable ground for believing that a preference in its favor would be effected thereby if there was no legal justification for the payment upon the grounds hereinafter considered. One of the special questions submitted to the jury was upon this point, and they answered it in the affirmative. Not only is this finding amply supported by the evidence, but a verdict to the contrary would, in my opinion, be clearly against the weight of the evidence.

■ The defendant contends that there was legal justification for the payment upon various grounds, the first of which is that the day loan was induced by the fraud of the bankrupt, and that the defendant, therefore, had the right to rescind it and to trace the money advanced into any securities purchased with it. All of the money drawn by the bankrupt under the day loan was used in the purchase of securities, some of which were resold by the bankrupt on the same day. Of the $82,156.58 received by the defendant in repayment, $60,732 was represented by checks received by the bankrupt as the selling price of securities so resold, and for present purposes may be considered in the same light as the securities themselves. The balance received by the defendant was not the proceeds of securities purchased with money from the day loan, but the bankrupt had on hand at the time of the repayment to the defendant securities or checks of the value of $17,530 which had been acquired with moneys from the day loan.

Even if there had been such fraud on the part of the bankrupt as would have given the defendant the right to rescind the loan and trace the proceeds, it could not justify the payment in suit. The defendant did not rescind the loan, but accepted repayment of it in accordance with the express terms of the note. It is urged that in doing so the defendant relinquished a right to trace and recover the proceeds of the loan, thereby benefiting the estate pro tanto, and that therefore the payment should be offset to the extent of the value of the securities which might have been recovered. This argument finds support in Illinois Parlor Frame Co. v. Goldman (C. C. A.) 257 F. 300, and Fisher v. Shreve, Crump & Low Co. (D. C.) 7 F.(2d) 159, but in Cunningham v. Brown, 265 U. S. 1, 44 S. Ct. 424, 68 L. Ed. 873, the Supreme Court held that a right to rescind for fraud which is not exercised does not validate an otherwise preferential payment. Nothing was said about fraud at the time of the payment nor was it a reason actuating either the defendant or the bankrupt. Indeed, it does not even appear that the defendant was aware of the circumstances upon which it now predicates it.

■■ But there was no fraud in the legal conception, whatever might be that of ethics. Upon that issue counsel agreed to submit the

following special question to the jury: "Did the bankrupt through its agents and employees fraudulently misrepresent by concealment or otherwise its financial condition to the defendant when the day loan of July 2, 1930 was applied for?" and the jury answered it in the affirmative. The evidence conclusively shows that the application was an entirely routine matter, and that no express representation of any kind was made at that time as to the bankrupt's financial condition. The defendant was merely notified that the bankrupt applied for a day loan of $150,000 and its note and check in that sum were presented, after which the defendant credited the general deposit account with that sum. About eight months previously in November, 1929, the bankrupt had delivered to the defendant a financial statement which showed a solvent condition, and on two occasions within the eight months some officer of the bankrupt had orally stated to a representative of the defendant in vague and indefinite terms that the bankrupt's financial condition was all right. There is no evidence that the financial statement of November, 1929, was untrue, nor that the subsequent oral remarks were fraudulent. Furthermore, these express representations made so long in advance must be held to have been inapplicable to the date of the loan, since the financial world was undergoing such violent disturbances during the entire period.

On the other hand, the evidence is conclusive that on the morning of July 2, 1930, before the day loan was applied for, the officers of the bankrupt knew that it was seriously insolvent, and that it would be unable to continue its business unless they received some extraordinary financial aid which they intended to seek that day. It was, however, not until after the defendant had made the loan and the moneys had been withdrawn by the bankrupt that the officers were apprised that the extraordinary aid was denied them and that the bankrupt would have to stop business.

The question is therefore presented whether a borrower is legally guilty of fraud where he knows of his own serious insolvency and knows that the lender would not advance the money if apprised of the condition, but where the borrower makes no express representation and merely fails to divulge the fact. There is no element in this case of an intention not to repay the loan. Such a finding would be entirely unsupported by the evidence. The bankrupt actually did repay the loan, and all the circumstances tend to indicate that such was its intention throughout the day.

Under those circumstances, it seems to me that as a matter of law it must be held that the bankrupt was not guilty of fraud, even though some question might be presented in the realm of ethics. At the close of the trial I intimated the view that there was presented a question of fact as to whether the bankrupt did not impliedly misrepresent its condition, in the circumstances that it failed to divulge facts which the bankrupt knew would have deterred the defendant from making the loan. The cases, however, hold that these circumstances are not sufficient to constitute rescindable fraud in the absence of an intention not to repay. In re Sol Aarons & Co. (C. C. A.) 193 F. 646; In re Sherman (C. C. A.) 13 F.(2d) 121; In re Independent Coal Corp. (C. C. A.) 18 F. (2d) 1; Hyman v. Trow, etc., Co. (C. C. A.) 261 F. 991. The special finding of the jury, therefore, that fraud existed in the procurement of the loan, is without any evidence to support it, and must be set aside.

The second ground upon which defendant seeks to justify the payment to it of the $82,156.58 is based upon the express terms of the loan note. They constituted a contract to pledge with the defendant any securities purchased with the avails of the note and not resold during the day. In re Perpall (C. C. A.) 261 F. 858. The defendant received no securities, but some of the checks in the amount of $60,732 were the proceeds of such securities so resold, and the note expressly provided that they would be turned over in partial payment. Furthermore, in relation to the remainder of the checks, the bankrupt had on hand at the time of the payment securities of the value of $17,520 which under the terms of the note were deliverable to the defendant.

■ Considering, first, what would have been the defendant's rights if securities purchased with the avails of the day loan had been turned over to it after knowledge of the insolvency, it should be recognized that no lien was created by the mere delivery of the note, though defendant advanced its money on the promise of such a lien. Defendant had only an inchoate right to a lien until the securities were delivered, and this probably could not have been perfected by a filing pursuant to the New York Lien Law (Consol. Laws, c. 33), section 230, because of lack of specification of the securities. But upon a subsequent delivery the lien would have relat-

ed back to the time when it had been contracted for and the defendant had paid its consideration for it.

■ Would the fact that in the few hours between the making of the loan and the receipt of the securities the defendant had been apprised of the insolvency have invalidated the pledge as against other creditors? It seems to me it would not, and that defendant should not be relegated to the position of a creditor who is given a lien which had never been promised and for which no present consideration was paid. The defendant's consideration should be deemed a present one because, while not paid at the time the supposed lien was perfected, it had been paid when the lien was contracted for, and under the authorities the acquisition of possession relates back to the making of the contract in the absence of intervening equities. Goldstein v. Rusch (C. C. A.) 56 F.(2d) 10; In re Glover Specialties Co. (D. .C.) 18 F.(2d) 314; Coppard v. Martin (C. C. A.) 15 F. (2d) 743; In re Automobile Livery Service Co. (D. C.) 176 F. 792.

No intervening equities were created by the fact that the defendant became apprised of the insolvency in the meantime. The bankrupt's financial condition remained the same, and the trustee's rights did not attach until the next day. Considering the transaction as a whole, the general creditors would have been in no way prejudiced by it.

It would, of course, have been manifestly unfair if the defendant had extended an unsecured general credit of even only a few hours' duration, and the bankrupts had thereafter granted a lien without a new consideration. But the situation was that under the terms of the contract the bankrupts could not withdraw a dollar of the money loaned without thereby acquiring a security upon which the defendant was promised a lien. There was no lack of identification of the security covered by the promised lien, even though not specified in the loan note, because it was positively identified in the very act of withdrawing the money. The defendant did not part with a dollar until it had the protection of the inchoate lien on a specific security. While such securities were not segregated, they remained identifiable, and a delivery of them to the defendant would have perfected the lien.

Does the fact that some of the securities were resold the same day, and checks in the amount of $60,732 received therefor were delivered to the defendant in lieu of them, change the latter's rights? The loan note provided that such checks would be received in payment rather than as a pledge, but counsel do not mention that circumstance, and I do not see any importance in it. The checks stood in the place of the securities, and under the contract the defendant had the same right to the possession of them. It made no possible difference to the general creditors which were delivered.

■ As to the checks representing the sum of $17,530 which were not the proceeds of securities purchased with the avails of the day loan, the note gave the defendant no right to possession. It is true the bankrupts had on hand at the time of payment securities of that value which they could have validly delivered to the defendant under the contract, but they saw fit not to do so. Though such delivery would have perfected defendant's lien, the absence of it left the defendant with no rights enforceable against the general creditors in regard to those securities, because the trustee could not be compelled to make delivery. The defendant contends that in accepting these checks it surrendered a right to a lien on the securities in the same amount and therefore benefited the estate pro tanto. But it had no such right enforceable against the estate; and, furthermore, at the time of payment, there was no new agreement made by the defendant and the bankrupts that any rights be surrendered. The fact is that the indebtedness was paid without regard to any inchoate rights which the defendant might have had in these securities, and the situation was somewhat analogous to that in Cunningham v. Brown, 265 U. S. 1, 44 S. Ct. 424, 68 L. Ed. 873, where the payment was held preferential.

As to the remainder of the checks delivered to the defendant and amounting to $3,894.58, there is no possible reason for not holding the payment preferential. They were not derived from the day loan, and did not correspond to securities so derived.

■ The plaintiff's contention that the day note gave no specific rights to the defendant because the amount of it was credited to the bankrupt's general deposit account is untenable, and the two cases relied upon, National City Bank v. Hotchkiss, 231 U. S. page 50, 34 S. Ct. 20, 58 L. Ed. 115, and Mechanics' & Metals' National Bank v. Ernst, 231 U. S. 60, 34 S. Ct. 22, 58 L. Ed. 121, are inapplicable because in those cases the day loan note did not purport to give such rights. It is impossible for me to see why the mere crediting of the loan to a general account should override the express contract of the

parties. The form of the credit and the fact that the securities purchased with it were not kept segregated might be important, in the absence of an express agreement and of a delivery under it, but in the present case are immaterial.

A verdict will therefor be directed for the plaintiff in the sum of $21,424.58.